IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WESTWAY HOLDINGS CORP., et al., | : : : | |
| Plaintiffs, | : : | CIVIL ACTION |
| v. | : : | NO. 08-CV-0841 (JCJ) |
| TATE AND LYLE PLC, et al., | : : : | |
| Defendants. | : | |

**DECISION**

**Joyner, J.**                                                                                  **August 10, 2011**

**BACKGROUND**

Plaintiffs and Defendants are both in the business of trading molasses. As part of Plaintiffs' 2002 stock purchase from Defendants, the parties entered into the Noncompetition Agreement at the heart of this breach-of-contract case. On October 21, 2009, this Court granted summary judgment to Plaintiffs on their breach-of-contract claim, finding that Defendants had breached the Noncompetition Agreement by (1) storing molasses in the Restricted Area before July 17, 2007, and (2) selling molasses in the Restricted Area after July 17, 2007, when such molasses had been purchased in the Restricted Area before July 17, 2007. (D.I. 35, at 11-12.) The Court gave Plaintiffs thirty days to submit detailed records regarding any damages and Defendants fourteen days thereafter to respond.

1

After reviewing the parties' submissions, the Court denied Plaintiffs' request for damages without prejudice, holding that Plaintiffs had failed to establish their damages to a reasonable degree of certainty and had failed to establish a reasonable basis for the computation of their damages. (D.I. 55.)[1] More specifically, the Court found that (1) "little to no evidence has been presented . . . to substantiate Plaintiffs' allegation that it conducted extensive negotiations with potential buyers and that those buyers would have in fact purchased their molasses if not for Defendants' breach" and (2) "Plaintiffs have not shown that their method of calculating their profit margin from the sale they would have made if not for Defendants' breach was reasonable." (Id. at n.1.) The Court granted Plaintiffs leave to request a hearing on the issue of damages, and the hearing was ultimately held on September 28, 2010. The parties thereafter submitted their respective Proposed Findings of Fact and Conclusions of Law, and responded to the other side's submissions. (D.I. 74, 75, 79, 81.) In light of all the foregoing, the Court now makes the following:

---

[1] Plaintiffs, relying on an affidavit from their president, requested damages for

> (1) the lost profit, including interest thereon, on the sale of Mexican molasses in the fermentation market within the Restricted Area that Westway could have completed but for Tate & Lyle's breach; (2) the loss incurred by Westway in being forced to dispose of the Mexican molasses in the depressed animal feed market; and (3) the fees and expenses incurred by Westway in this action as provided for in Section 5(c) of the Agreement.

(D.I. 38, at 3.)

**FINDINGS OF FACT**

**General finding**

1. Plaintiffs' primary competitors in the molasses-trading industry were Defendants. (N.T. 6.)

**Existence of Plaintiffs' damages from Defendants' sales to Lesaffre**

2. Lesaffre Yeast Company generally purchased 30,000 tons of Mexican molasses per year, in three installments of 10,000 tons each. (N.T. 10-11, 146.)

3. Plaintiffs supplied Lesaffre with Mexican molasses for many years prior to and including 2006. (N.T. 10, 147.)

4. Up through 2006, Lesaffre had never accepted an offer from Plaintiffs for molasses originating outside of Mexico. (N.T. 10.)

5. In 2006, Plaintiffs supplied Lesaffre with approximately 10,000 tons of Mexican molasses in the summer and approximately 10,000 tons of Mexican molasses in November. (N.T. 33, 38-40.)

6. In 2006, Lesaffre received the other 10,000 tons of Mexican molasses from Defendants. Plaintiffs asserted that this April 2006 delivery by Defendants was a breach of the Noncompetition Agreement. To settle the dispute, Defendants agreed to extend the Noncompetition Agreement's duration. (N.T. 33, 38-40.)

7. For the 2007 delivery year, Plaintiffs purchased 30,000 tons of Mexican molasses to sell to Lesaffre. (N.T. 15-16, 33-37.)

8. From November 2006 to June 2007, Plaintiffs negotiated with Lesaffre to supply the latter with this molasses in 2007. During this time, Lesaffre repeatedly reached out to Plaintiffs in an effort to conclude an agreement. (N.T. 15-16, 33, 45-46, 147-68; Randle-Alberts email chain, PX 22; Randle-Alberts email chain, PX 36; Randle-Alberts email chain, PX 43; Randle-Alberts email chain, PX 45; Randle-Alberts email chain, PX 57.) Nonetheless, throughout this period, Lesaffre maintained that Plaintiffs' prices were too high compared to competing offers. (N.T. 147-48, 155-56; Randle-Alberts email chain, PX 19; Randle-Alberts email chain, PX 22.) The competing offers were those made by Defendants. (E.g., Randle-Alberts email chain, PX 22.)

9. On January 25, 2007, Defendants entered into an agreement with Lesaffre, whereby Defendants agreed to sell 20,000 tons of molasses of "any Central American origin"–18,000 tons ±5% in the seller's option, plus an additional 2000 tons. (Sale contract, PX 28.) Defendants understood "any Central American origin" to include Mexican molasses. (N.T. 211.) The first shipment was to be in late April 2007 and the second shipment in late August 2007. Lesaffre could also buy an additional 10,000 tons to be delivered in October or November 2007. (Sale contract confirmation, PX 27.)

10. Plaintiffs ultimately were unable to conclude an agreement to sell Lesaffre molasses for 2007. (N.T. 168.)

11. Pursuant to their agreement, Defendants provided 9247 tons of Belizean molasses to Lesaffre in April 2007. (Provisional Sales Invoices and Certificate of Origin, PX 50; Spreadsheet, DX 109.) Sale and delivery of Belizean molasses was not a breach of the Noncompetition Agreement. (E.g., N.T. 179-81.)

12. On July 23, 2007, the agreement between Lesaffre and Defendants was amended to specify the origin on the remaining shipments as Mexican. (N.T. 215; Sale contract confirmation, PX 60.)

12. Pursuant to their amended agreement, Defendants provided 10,519 tons of Mexican molasses to Lesaffre in August 2007. (Spreadsheet, DX 109.) This delivery was a breach of the Noncompetition Agreement.

14. Also pursuant to their amended agreement, Defendants delivered 10,278 tons of Mexican molasses to Lesaffre in December 2007. (Spreadsheet, DX 109.) This delivery was also a breach of the Noncompetition Agreement.

15. No other competitor could have delivered the same quantity of Mexican molasses during that time. (Huguley Supp. Aff. para. 4, DX 2.)

16. Plaintiffs would have sold the approximately 10,000 tons of Mexican molasses provided to Lesaffre in August 2007 if

not for Defendants' involvement in the Restricted Area in breach of the Noncompetition Agreement.

17. Plaintiffs would have sold the approximately 10,000 tons of Mexican molasses provided to Lesaffre in December 2007 if not for Defendants' involvement in the Restricted Area in breach of the Noncompetition Agreement.

18. After realizing that they would be unable to conclude an agreement with Lesaffre for 2007, Plaintiffs made reasonable and timely attempts to mitigate their losses by selling the unsold molasses into the animal-feed sector. (N.T. 47-49, 58-59, 62-64.) Plaintiffs delivered 10,295 tons of this molasses into the animal-feed sector in July 2007 and 9074 tons of this molasses into the animal-feed sector in December 2007. (N.T. 54-57; Vessel Costing Summary, PX 58; Vessel Costing Summary, PX 63.)

**Existence of Plaintiffs' damages from Defendants' sales to Gabso**

19. Gabso regularly purchased Mexican molasses. (N.T. 21-22, 169.)

20. In January through March 2007, Plaintiffs and Gabso discussed offers for Plaintiffs to sell Gabso Mexican molasses for 2007. (N.T. 170-173; Randle-Bonilla email chain, PX 32; Randle-Bonilla email chain, PX 38; Randle-Bonilla email chain, PX 39.) In May 2007, Plaintiffs specifically offered Gabso Mexican molasses for September 2007, but Gabso rejected the offer. (N.T. 173-74; Randle-Bonilla email chain, PX 54.)

21. Defendants had already been negotiating with Gabso to sell it molasses for 2007. In fact, Defendants negotiated a contract with Gabso in November 2006, whereby Defendants would sell molasses to Gabso for 2007. (N.T. 224.)

22. Plaintiffs were unable to conclude an agreement to sell molasses to Gabso in 2007. (N.T. 173-74.)

23. Defendants delivered 5514 tons of Mexican molasses to Gabso in December 2007. (Spreadsheet, DX 109.) However, only 3526 of these tons were purchased during the restricted period and thus a breach of the Noncompetition Agreement. (Id.)

24. No other competitor could have delivered the same quantity of Mexican molasses during that time. (Huguley Supp. Aff. para. 4, DX 2.)

25. Plaintiffs would have sold the 3526 tons of Mexican molasses to Gabso in December 2007 if not for Defendants' involvement in the Restricted Area in breach of the Noncompetition Agreement.

**Calculation of damages from Defendants' sales to Lesaffre**

26. The market rate for molasses was increasing in 2006 and into early 2007. (N.T. 39-40.) For example, Lesaffre paid $116 per ton in April 2006 for 10,000 tons of Mexican molasses from Defendants; $139 or $139.50 per ton in the summer of 2006 for 10,000 tons of Mexican molasses from Plaintiffs; and $142.50 per ton in November 2006 for 10,000 tons of Mexican molasses. (N.T.

7

39, 152; Purchase/Sale Confirmation & Randle-Alberts email chain, PX 12.)

27. In November 2006, Plaintiffs offered to sell Lesaffre Mexican molasses for $155-160 per ton for 2007. (N.T. 147-49, 151-53.) A sale price of $155 per ton would have yielded Plaintiffs a $15-20 per ton profit. (N.T. 17.)

28. Lesaffre responded to Plaintiffs' November 2006 offer by stating that Lesaffre had an offer from another source (Defendants) to buy at $135 per ton. (N.T. 147-48; Randle-Alberts email chain, PX 19.)

29. A sale price of $135 per ton would have been about the "break-even" point for Plaintiffs, with no profit or loss. (N.T. 98-99, 102.)

30. Plaintiffs made additional, lower offers to Lesaffre in subsequent months, in an attempt to compete with Defendants' lower offers to Lesaffre, but Defendants consistently undercut Plaintiffs. (E.g., Randle-Alberts email chain, PX 19; Randle-Alberts email chain, PX 20; Randle-Alberts email chain, PX 36.)

31. Defendants' selling of Mexican molasses in the Restricted Area in violation of the Noncompetition Agreement lowered the price that Plaintiffs would have received for the same sales had Defendants not been in the market. Thus, Defendants' selling prices to Lesaffre in 2007–$125 per ton for the July 2007 sale of Mexican molasses and $105 per ton for the September 2007 sale of Mexican molasses–are not the measure of

8

Plaintiffs' damages. (See Sale Contract Confirmation, PX 27; Spreadsheet, DX 109; N.T. 204; Roberts Aff. para. 8, PX 86.)

32. Moreover, the market rate for molasses was declining after the beginning of 2007, such that contracts made earlier in the year or in late 2006, for 2007 delivery, would have contained higher selling prices. (N.T. 96, 107, 133-34, 136.)

33. Defendants' and Plaintiffs' sales of other molasses to other customers in 2007 shed additional light on the price Plaintiffs would have obtained for sales of Mexican molasses to Lesaffre in 2007. For example, Defendants sold 30,000 tons of Fijian molasses to Caribbean Molasses for alcohol production on January 1, 2007, to be delivered at any time during 2007, at $155 per ton. (Sale contract, DX 34; Roberts Aff. para. 8, PX 86.)

Defendants sold 30,000 tons of Fijian or Central American molasses to Trinidad Distillers for alcohol production on January 25, 2007, to be delivered between September 1, 2007, and January 31, 2008, at $160 per ton. (Sale contract, DX 39; N.T. 195; Roberts Aff. para. 8, PX 86.)

Defendants sold 30,000 tons of molasses to Bacardi for alcohol production on July 3, 2007, at $144 per ton. (Roberts Aff. para. 8, PX 86.)

Defendants sold 15,000 tons of molasses to West Indies Rum Distillery, Ltd., for delivery between January and September 2007, at $140 per ton. (N.T. 195.)

9

Plaintiffs, in turn, had an average profit margin of $16.82 per ton on fourteen shipments of non-Mexican molasses to third-party customers in 2007, but could not identify any international sale of Mexican molasses that made a profit in 2007. (N.T. 40-41, 71-72; Huguley Aff. Ex. A, PX 84.) Moreover, in thirteen of Plaintiffs' fourteen shipments of non-Mexican molasses, the molasses included hi-test molasses, which in 2007 sold for slightly greater profit than the cane molasses Lesaffre purchased. (N.T. 43-44, 70-71.) On the other hand, the fourteen shipments were not of Mexican molasses, though Mexican molasses generally has a higher quality content than molasses from other origins and thus generally sells for a higher price. (N.T. 8-11, 67.)

34. In light of all the evidence, the most reasonable selling price for the approximately 20,000 tons of Mexican molasses that Plaintiffs would have contracted to sell to Lesaffre for 2007, but for Defendants' breach, would have been $142.50 per ton. This would have yielded a $6.64 per ton profit on the 10,295 tons Plaintiffs would have delivered in July (using the $135.86 per ton cost for that period) and a $2.84 per ton profit on the 9074 tons Plaintiffs would have delivered in December (using the $139.66 per ton cost for that period). Thus, Plaintiffs would have made a $94,128.96 profit.

**Calculation of damages from Defendants' sales to Gabso**

35.   In November 2006, Defendants contracted to sell molasses to Gabso for $149 per ton on a January 2007 shipment of 5500 tons, $155 per ton on a second 5500 tons, and $155 per ton on a third 5550 tons.  (N.T. 224; Roberts-Huguley email, PX 34; Sale Contract, DX 28.)

36.   In March 2007, Plaintiffs offered to sell Gabso Mexican molasses for $140 per ton for May and September 2007, but almost immediately modified the offer to $145 per ton.  (Randle-Bonilla email chain, PX 38; Randle-Bonilla email chain, PX 39; N.T. 138, 170-72.)

37.   Defendants ultimately reduced their November 2006 contract prices to undercut Plaintiffs' offers to Gabso. (Roberts-Huguley email, PX 34; N.T. 225.)

38.   When, by May 2007, Plaintiffs did not conclude an agreement with Gabso at $140-145 per ton, Plaintiffs offered to sell Gabso molasses at $125 per ton for September 2007, believing that Gabso had received its May 2007 molasses elsewhere. (Randle-Bonilla email chain, PX 54; N.T. 173-74.)

39.   Defendants ultimately delivered 5514 tons of Mexican molasses to Gabso in December 2007, 3526 tons of which were in violation of the Noncompetition Agreement, at $100 per ton. (Roberts Aff. para. 8, PX 86; Spreadsheet, DX 109.)

40.   Defendants' competition in the Mexican molasses market in violation of the Noncompetition Agreement lowered the price at

11

which Plaintiffs would have sold Mexican molasses to Gabso but for the breach, such that Defendants' ultimate selling price to Gabso is not the measure of Plaintiffs' damages.

41. In light of all the evidence, the most reasonable selling price for the 3526 tons of Mexican molasses that Plaintiffs would have sold to Gabso for 2007, but for Defendants' breach, would have been $142.50 per ton, giving a $7.50 per ton profit (using the $135 per ton cost). Thus, Plaintiffs would have made a $26,445 profit.

## **DISCUSSION**

### **A. Expectancy damages**

To recover for breach of contract under Illinois law, a plaintiff must establish both that it sustained damages and that there is a reasonable basis for computation of the damages. See, e.g., TAS Distrib. Co. v. Cummins Engine Co., 491 F.3d 625, 632 (7th Cir. 2007) (quoting Ellens v. Chi. Area Office Fed. Credit Union, 576 N.E.2d 263, 267 (Ill. App. Ct. 1991)).

The appropriate measure of damages for a breach of contract is expectancy damages–i.e., damages to place the plaintiff in the position it would have been in had the contract been performed. The damages are not to place the plaintiff in a better position than it would have been in absent the breach. See, e.g., Sharon Leasing, Inc. v. Phil Terese Transp., Ltd., 701 N.E.2d 1150, 1156 (Ill. App. Ct. 1998); Lanterman v. Edwards, 689 N.E.2d 1221, 1224

(Ill. App. Ct. 1998); Midwest Software, Ltd. v. Willie Washer Mfg. Co., 630 N.E.2d 1088, 1104 (Ill. App. Ct. 1994).

To restore a plaintiff to its expected position, a court may award lost profits. Of course, "recovery of lost profits cannot be based upon conjecture or sheer speculation." Midland Hotel Corp. v. Reuben H. Donnelley Corp., 515 N.E.2d 61, 66 (Ill. 1987). On the other hand, as the Illinois Supreme Court has explained,

> In order to recover lost profits, it is not necessary that the amount of loss be proven with absolute certainty. Being merely prospective, such profits will, to some extent, be uncertain and incapable of calculation with mathematical precision. As such, "[a] recovery may be had for prospective profits when there are any criteria by which the probable profits can be estimated with reasonable certainty."

Id. (quoting Barnett v. Caldwell Furniture Co., 277 Ill. 286, 289 (Ill. 1917)); see also Milex Prods., Inc. v. Alra Labs., Inc., 603 N.E.2d 1226, 1236 (Ill. App. Ct. 1992) ("That proof of the exact amount of loss is impossible will not justify refusing compensation. If that were the law, contracts of the kind here involved could be violated with impunity. All the law requires in cases of this character is that the evidence shall with a fair degree of probability tend to establish a basis for the assessment of damages." (quoting Schatz v. Abbott Labs., Inc., 281 N.E.2d 323 (Ill. 1972))).

Here, Plaintiffs have shown that they suffered damages when Defendants sold and delivered approximately 20,000 tons of Mexican molasses to Lesaffre and 3526 tons of Mexican molasses to Gabso in violation of the Noncompetition Agreement: but for these three breaches, Plaintiffs would have made these three sales and deliveries, as the Noncompetition Agreement effectively rendered Plaintiffs the exclusive supplier of Mexican molasses during that time.[2]

Plaintiffs have also provided a reasonable basis for calculating the profits Plaintiffs would have made on these three sales. Among other evidence, Plaintiffs showed the selling price for the same product, to the same customer (Lesaffre), the year prior to the breach. See Brandenburg v. Buda Co., 132 N.E. 514, 517 (Ill. 1921) ("[T]he total amount of . . . products shipped by appellant during various years of the contract, and . . . the total amount of money, etc., paid to appellant for . . . products for similar years, . . . are relevant, or might become relevant, to prove damages or losses to the appellees although such questions pertain to years prior to the year [in question]. In other words, [such information] might throw light upon or furnish

---

[2] Although Plaintiffs sought additional damages beginning at the hearing, based on the sales of Belizean molasses to Lesaffre and Honduran molasses to Gabso in 2007, the Court is not convinced that Plaintiffs would have made these sales but for the breaches.

14

a basis for estimating the amount of the business that would have been transacted between the parties for the year [in question], had they continued doing business that year."); Girsberger v. Kresz, 633 N.E.2d 781, 791 (Ill. App. Ct. 1993) ("Evidence of past success in [merely] similar endeavors is not sufficient to support an award of lost profits, as conditions may vary with each endeavor.  Projections appropriately founded upon past demonstrated profits[, however,] may establish lost profits with the requisite degree of probability." (citation omitted)).

Plaintiffs have also shown the prices being negotiated for the very sales in question, as well as sales of other molasses in 2007.  The Court found Plaintiffs' witnesses' testimony on these topics credible.  See generally Rittenhouse v. Tabor Grain Co., 561 N.E.2d 264, 272 (Ill. App. Ct. 1990) ("In Illinois, the valuation of property is a question of fact.  As a result, any person with special knowledge of the subject property is thereby qualified to testify as a valuation witness.  In this action, Dean has acquired such knowledge through his employment as president of Long Point.  Under these circumstances, Dean was qualified to testify as a valuation witness for Long Point in the action." (citations omitted)).

Although Illinois courts have in some cases used a defendant's profits (or lack thereof) to determine what the

15

plaintiff's profits (or losses) would have been, see Tas Distrib., 491 F.3d at 634-35, Rhodes v. Sigler, 357 N.E.2d 846, 850 (Ill. App. Ct. 1976), this is not the appropriate measure here, because Defendants' improper competition drove down the selling prices.

After a review of all the evidence, the Court finds that Plaintiffs' lost profits can be estimated with reasonable certainty by multiplying the number of tons they would have delivered to Lesaffre and Gabso by the most reasonable profit per ton they would have been able to achieve. Thus, Plaintiffs have established lost profits of $120,573.96.[3]

### B. Mitigation

"A party injured by a breach of contract is required to use all reasonable means to mitigate his damages." Pokora v. Warehouse Direct, Inc., 751 N.E.2d 1204, 1213 (Ill. App. Ct. 2001); see also Amalgamated Bank of Chi. v. Kalmus & Assocs., 741 N.E.2d 1078, 1086 (Ill. App. Ct. 2000) ("The duty to mitigate

---

[3] Plaintiffs are not entitled to an additional award of damages for the "loss" incurred in selling the molasses that Lesaffre and Gabso would have purchased into the animal-feed market. The lost-profits award already takes into consideration the purchase price and other costs Plaintiffs incurred in obtaining and selling the molasses. The lost-profits award thus places Plaintiffs in the position they would have been in had they purchased and sold to Lesaffre and Gabso the molasses that Defendants instead sold in breach of the agreement. Had Plaintiffs made these sales, they would not have had any molasses to sell into the animal-feed market. (N.T. 73-74.) An award of damages for the animal-feed "losses" would therefore constitute a double recovery.

damages imposes a duty on the injured party to exercise reasonable diligence and ordinary care in attempting to minimize his damages after injury has been inflicted." (internal quotation marks omitted)).  If a defendant proves that the plaintiff failed to mitigate, "the amount of loss that could reasonably have been avoided by . . . making substitute arrangements is simply subtracted from the amount that would have otherwise have been recoverable as damages."  R.R. Donnelley & Sons Co. v. Vanguard Transp. Sys., Inc., 641 F. Supp. 2d 707, 717 (N.D. Ill. 2009).  Importantly, however, "[t]he duty to mitigate will not be invoked as grounds for a hypercritical examination of a plaintiff's conduct."  Amalgamated Bank, 741 N.E.2d at 1087; see also Vanguard Transp., 641 F. Supp. 2d at 717 ("[W]hile [the plaintiff] must act with 'reasonable dispatch,' the injured party is not required to take steps that involve 'undue risk or burden.'" (citation omitted)).

Defendants have not met their burden of proving that Plaintiffs failed to mitigate their damages after Defendants' breach.  Plaintiffs' witnesses testified to their efforts to sell the molasses for as much profit (and as little loss) as possible, ultimately disposing of the molasses in the animal-feed sector. The Court found the witnesses' testimony credible and concludes

that Plaintiffs' selling of the molasses into the animal-feed sector was both timely and reasonable.

**C.  Attorney's fees**

"The rule in Illinois is well[-]established that attorney fees and the ordinary expenses of litigation are not allowable to the successful party in the absence of a statute or specific agreement of the parties."  J.B. Esker & Sons, Inc. v. Cle-Pa's P'ship, 757 N.E.2d 1271, 1278 (Ill. App. Ct. 2001) (internal quotation marks omitted).

In this case, the Noncompetition Agreement provides that, if Defendants breach the Agreement, they are "liable to pay and indemnify [Plaintiffs] against [their] payment of the legal fees and expenses reasonably incurred by [Plaintiffs] in connection with any legal proceeding arising from or relating to such breach."  (Noncompetition Agreement 9, PX 1.)  While Defendants argue that Plaintiffs should not recover any attorney's fees because any damages awarded would be small in relation to the damages requested, the question of <u>entitlement</u> to attorney's fees is distinct from the question of the <u>reasonableness of the amount</u> requested.  See, e.g., J.B. Esker, 757 N.E.2d at 1277 ("The fact that the court did not grant defendant the total amount of its counterclaim does not alter the fee-shifting agreement.  When a contract calls for the shifting of attorney fees, a trial court

should award all reasonable fees."); Shoreline Towers Condo. Ass'n v. Gassman, 936 N.E.2d 1198, 1208-09 (Ill. App. Ct. 2010).

The Court sees no reason to reject the parties' contractual fee-shifting arrangement simply because Plaintiffs have not been awarded the full dollar amount of damages they requested. Defendants may challenge, and the Court will evaluate, the reasonableness of the amount of attorney's fees requested, once Plaintiffs document the amount for which they seek reimbursement. At this juncture, however, the Court is only determining that Plaintiffs are entitled to the benefits of the fee-shifting provision.

In light of all the foregoing, the Court now states the following:

## **CONCLUSIONS OF LAW**

1.  Plaintiffs have shown with reasonable certainty that, because of Defendants' breaches, they lost $94,128.96 in profits from unrealized sales to Lesaffre and $26,445 in profits from unrealized sales to Gabso for 2007.

2.  Plaintiffs are not entitled to an additional award of damages for the "loss" incurred in selling molasses into the animal-feed market because such an award would constitute a double recovery.

3.  Because Plaintiffs acted reasonably in attempting to mitigate their losses, the Court cannot subtract from Plaintiffs'

award any amount for what Defendants argue was a "failure to mitigate."

    4. Plaintiffs are entitled to reasonable attorney's fees and expenses pursuant to their Noncompetition Agreement.